# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00222-CR

---

**Roberto Rico Hernandez, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 428TH DISTRICT COURT OF HAYS COUNTY
### NO. CR-10-0473-D, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Roberto Rico Hernandez was convicted by a jury of aggravated sexual assault of a child and indecency with a child by sexual contact. *See* Tex. Penal Code §§ 21.11(a)(1), 22.021(a)(1)(B)(i), (2)(B). The trial court sentenced Hernandez to twenty-five years' and five years' confinement on those charges, respectively, and ordered that the sentences run concurrently. In a single issue, Hernandez contends that the trial court abused its discretion by denying his request for a hearing on his motion for new trial. We affirm the trial court's judgments of conviction.

## BACKGROUND

Following outcries by his stepdaughters, Hernandez was charged by indictment with four counts of aggravated sexual assault of a child and three counts of indecency with a child by sexual contact. At trial, the State presented testimony from 16 witnesses, including the

children, Maria and Ana Perez[1]; their mother (Mother); CPS investigator Katie Wilson; current and former Hays County Sheriff's Office (HCSO) personnel; sexual assault nurse examiner (SANE) Corrine Trainer; forensic scientists Jennifer Howard, Allison Heard, and Caitlin Lott; and forensic interviewers Melissa Rodriguez and Maggie Ortuno. The defense recalled several of the State's witnesses and offered testimony from Dr. Robert C. Benjamin, a DNA forensic-testing expert; Dr. Aaron Pierce, an expert in forensic interviews; Hernandez's wife; and his former employer.

Maria Perez, who was 18 at the time of trial in 2021, testified regarding two 2010 incidents in which she was assaulted by Hernandez and explained inconsistencies in statements that she had given between the incidents and trial. The first incident occurred in the family's two-bedroom trailer in San Marcos on the evening of January 8, 2010, when Maria was six. While Mother was showering, Hernandez came into Maria's bedroom. Ana, then eight, was in the other bedroom with her and Maria's infant half-brother. Hernandez pulled down Maria's pajama bottoms and underwear and touched her vagina with his hand. Although she at first testified that his hand did not go inside her vagina, she later agreed that "part or a little bit of the time his fingers went on the inside." After he left the trailer, she told Ana what had happened, and Ana told Mother, who called the police. Maria was examined by a SANE approximately three hours after the incident and was forensically interviewed by Rodriguez on January 11, 2010.

In the interview, Maria denied 15 times that Hernandez had touched her inappropriately, that someone had done "something to [her]," or that anything had happened to

---

[1] Because the children were minors at the time of the offenses, we will refer to them by pseudonyms in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

2

her. However, when asked if Hernandez had done "something wrong," she stated that he "raped" her and Ana, that he "raped . . . [Maria's] butt . . . with the tongue," that he licked her "butt," that he only touched her with his tongue, and, conversely, that "he didn't do anything with the tongue." Maria testified at trial that at six years old she had heard the word rape but did not know what it meant and that she had been untruthful when she told Rodriguez that Ana had been touched inappropriately "like 10 times," that Hernandez touched Maria's private part with his tongue, and that she had seen Hernandez rape Ana. She clarified that Hernandez had not touched her with his tongue but had "used his fingers to touch [her] vagina." As to whether he had "raped [Ana]" in 2010, she testified that Ana "told [her] it happened to her, too."

Within a few months of the first incident, Hernandez "came back into [Maria's] life" after Mother forgave him. The family had moved into a yellow two-bedroom house, and he was there one night while Mother was at work. Maria awoke to him "touching" her; he pulled down her pajama bottoms, touched her vagina and breasts with his hands and fingers underneath her clothes, and put his fingers into his mouth between touches. Asked whether his fingers went inside her vagina, Maria testified, "Just like the first time." When Mother returned home, Maria told her what he had done, and he left the house after the couple argued.

Maria participated in a second forensic interview in 2019, when she was 15. She told the interviewer, Ortuno, that Hernandez would "physically touch" her and Ana on their "private areas" and breasts with his hands; that he touched Maria twice; and that Ana told Maria that he had touched her too, but Maria did not "know if it was true." When asked whether he touched them with something other than his hands, Maria nodded and responded, "Not—his like—I don't want to talk about it." She then wrote the word "mouth" on a piece of paper and stated that he would touch her private area with his mouth. Later in the interview, however, she

3

clarified that his mouth never directly touched her private area but that "he would just like put his hands in his mouth and then put them on [her]." Shown a drawing of a body, she confirmed that his fingers went "past the line or inside of the line" on the private area.

Maria testified that the 2019 interview was the first occasion on which she stated that Hernandez had touched her vagina with his fingers. She testified that at first, she "held stuff back," but she "really need[ed] to say what happened to [her] now."

Ana Perez, 20 years old at trial, also testified about her and Maria's being abused by Hernandez. In 2009 or 2010, the sisters were eating breakfast when Maria asked if Ana could keep a secret and told her "stuff that [Hernandez] did to her." Ana disclosed Maria's statement to Mother, who called the police. Although Ana did not recall exactly what Maria had said, Maria did not use the word "rape" in describing it to her.

Like Maria, Ana was forensically interviewed by Rodriguez on January 11, 2010. During the interview, Ana stated that Hernandez left the family's trailer because "he [did] something to [Maria]," "licked her hin[e]y," "picked her up and . . . pulled down her pants," and "stuck his finger in her butt." When asked whether he "raped [Maria's] hin[e]y," Ana replied, "Uh-huh." Ana told Rodriguez that she knew that this had happened because Maria told her; Ana had not seen what Hernandez did because she was in another room with her brother. She also told Rodriguez that, while Mother was showering, she had heard Maria screaming, "[H]elp, help"; that "[Maria] was also saying other little things like, '[J]ust let me go daddy, just let me go'"; and that Ana had thought "it was tickling" because "[her] dad was there . . . doing something to [Maria]." Later, Maria told Ana that Hernandez "licked [her] butt and he put his finger in [her] butt." Ana stated that when she told Mother what Maria had said, Mother and Hernandez "talked like that, that made [Mother] cry." Elsewhere, Ana stated that Hernandez

4

gathered clothes, wrote a letter for Mother, and left while she was showering.  In response to Rodriguez's questioning, Ana repeatedly denied that Hernandez had done "anything like that" to her.

However, at trial, Ana testified that she had lied when she denied being abused. Around the time that Hernandez assaulted Maria, Ana experienced leg pain, and he offered to apply alcohol to her leg, told her to lie down, and insisted that she remove her underwear.  She complied, and, while rubbing alcohol on her leg, he "put his finger inside" her vagina.  She testified that this was the only time that she remembered him doing something like that to her and that she had not reported the abuse because she was scared and felt guilty that, had she done so, Maria would not have been assaulted.  She explained that she had come forward because she "saw [Maria] was getting her justice and wanted the same."

Mother, who is Spanish-speaking, testified through an interpreter about Hernandez's abuse of Maria as well as Mother's relationship with him.  She became aware of the first assault because Hernandez "left a letter for [her].  And besides, [her] daughters told [her] what happened."  Ana told her that Hernandez took Maria's pants off, that he touched Maria in her "private parts," that Maria had "some pain," and that he left with a suitcase while Mother was in the shower.  She obtained "the same information" from Maria and learned that he had touched her with both his hands and mouth.  Mother had been upset with him for coming home late that evening, but they had not fought or yelled at one another.  Hernandez had not said anything about their relationship not working nor expressed a need to leave.  In his letter, he wrote, "Love[,] I want to tell you that I love you a lot but you don't trust me anymore and that's killing me.  That's why I'm leaving you because you don't trust me.  I love you but I think it's better this way."  He also wrote that he intended to visit his son "as many time[s] as [she]

5

allow[ed] him." She tore up the letter because it "didn't make sense," and she and her daughters cried "because of what happened." She called the police that night.

A few days after the incident, Hernandez called her from a number with a Mexican area code to tell her that he "didn't know why he did that," that "he was out of control," that he had touched Maria, and that he was in Mexico "trying to get better." He blamed witchcraft and suggested that his mother "was doing, like, maybe some sort of sorcery so [they] could split." He also told her "that something gets into his mind and makes him do these things." Mother did not reveal the call to police because she wanted to believe him, still loved him, and was scared that CPS would take away her children.

In March, Hernandez returned from Mexico, and they attempted to resume their relationship; however, while she would allow him to come to the house, he did not live with her or her children. On the evening on which the second incident of abuse against Maria occurred, Mother was at work, and her sister was watching Maria and Ana while he was at the house. Her sister had to leave early, and Mother told her to put the girls to bed and lock the bedroom door. When Mother returned home, her son was on her bed, and Hernandez was masturbating in the bathroom. She went to Maria and Ana's bedroom, which was locked, and when she entered, Maria began crying and told her that "her dad didn't change and that he didn't want to change and that he was not seeking for forgiveness because he did it again." Maria also told her that Hernandez had used something to open the door, that he had touched Maria "in her private parts" with his hands, and that Ana had not awoken. Mother confronted him, and he "admitted everything, but he said it was something that's stronger than him," "that it was something that would get into his mind," and that it was like "a person would get into his mind." He showed her the knife he had used to open Maria and Ana's bedroom door, and she kicked him out of the

6

house.  She did not call the police on that occasion or when Ana later told her that he had put his fingers inside Ana's vagina.  When CPS asked in June 2010 if Hernandez had attempted to contact her, she lied and said that he had not.

On recall by the defense, Mother testified that Hernandez attempted to reconcile with her because he wanted her forgiveness and to see his son.  He "knew what he had been accused of."  She acknowledged that she had invited him to spend Christmas with her in 2010 and agreed that she had testified in a 2019 proceeding that she had "frequent and continual" contact with him in 2010 and that she had "always been in contact with [him] via phone."  She testified at trial that she did not report the second assault because she "just wanted to believe what he was saying" but continued, "It happened exactly the way that my daughters told me, because he accepted that.  He told me that and he asked for forgiveness from me and my children."

CPS Investigator Katie Wilson testified that she met with the family on January 11, 2010, and that CPS was not investigating whether there was penetration; the sole allegation, rather, was that Hernandez had licked Maria's privates.  Wilson testified that she had seen children not disclose everything during their first outcries and be confused about what happened to them sexually.  Mother told her that she did not understand why Hernandez did what he did but suspected that it was a "one-time incident."

HCSO Deputy Amy Stacy testified about information she received when she responded to the family's trailer on January 8, 2010.  When she arrived, Stacy observed Mother, Maria, and Ana crying on the couch.  Two medics assisted Stacy, who speaks "broken" Spanish, by translating for Mother.  Maria was writing in a journal, and Stacy saw that she had drawn a circle with a line through it around a heart.  Next to the heart she had scratched out "Rico,"

Hernandez's middle name. Mother told Stacy that Hernandez had put his mouth "in the area of the anus of [Maria]." Mother also showed Stacy a text message purportedly from him, "advising that he had left the car at the bus station" and stating, "[M]any apologies and take care of the baby." Mother's car was subsequently found at the station, and a bus company employee confirmed that Hernandez had tried to purchase a ticket to Mexico.

Mother later told Stacy that she had received a call from Hernandez's mother's phone number in which he informed Mother that he was in Mexico. He repeatedly apologized and stated that a trucker took him to Mexico and that he had left his cell phone in the car at the bus station. Stacy wrote in her report that Mother "did not go into detail about what he was apologizing for, but she felt certain that it was for molesting [Maria]."

Corrine Trainer, a SANE, testified about Maria's sexual assault forensic examination (SAFE), which Trainer performed on January 9, 2010, at approximately 12:15 a.m. Through an interpreter, Mother told Trainer:

> My little one told me her father had touched her while I was taking a bath. He had gone into the room where she was watching TV and took her pants and panties off and he put his fingers in her butt a lot of times and had licked her butt many times.

Mother also told Trainer that Ana "did not see anything" but "heard her sister screaming" and "thought her sister was playing around." Mother reported that Maria had not showered or bathed, been washed or wiped, vomited, had anything to eat or drink, brushed her teeth, or changed her clothes since the incident. It was unknown whether she had used the restroom. Maria stated that Hernandez "had licked her butt" and touched her and Ana with "[h]is hands on her feet and legs."

8

Trainer noted redness in Maria's labia minora and testified that it "may support or not support the history." She took swabs of Maria's cheek, vagina, and anus and collected dried secretions from her left thigh and left breast. When asked by defense counsel whether saliva, if tested, will contain "an abundance of DNA," Trainer testified, "Yes, as far as – you know, I'm not an expert on DNA, so, yes."

Jennifer Howard, a forensic scientist in the Trace Evidence Section of the Austin Crime Laboratory, testified that she reviewed tape lifts taken from Maria's bedding and clothes and a towel recovered from Maria's bed and that "there were a variety of trace evidence that was identified, including animal hairs, body hairs, hair fragments, possible carpet fibers, apparent paint, apparent head-hair fragments, and possible pubic hair." Howard testified that hair comparison is used "more as an exclusionary technique," that she did not compare the pubic hair because there was no "standard" from a known individual against which she could compare it, and that she could not "make any deductions about who that hair may have belonged to at all." She also testified that there was no confirmation that the evidence was in fact pubic hair.

Allison Heard, who in 2010 was a forensic scientist at the Department of Public Safety crime lab in Austin, testified about the results of short tandem repeat (STR) DNA testing that she performed on the swabs and secretions obtained from Maria. Heard testified that DNA transfer "does not always occur" with skin-to-skin contact but "can occur." Saliva-to-skin contact would be more likely to transfer DNA "because of the amount of DNA in saliva," which, however, is "more attributable to the skin cells from the inside of the mouth" than from saliva itself. Heard explained that "you have a lot of skin cells in your inner cheek." She also testified that DNA transfer is dependent on other factors, including "time since a sample was collected or any type of activity that may have, like, washed off or removed some of those cells"; using the

9

restroom and wiping "definitely would be a possibility to have some of that foreign DNA be wiped away."

Heard's analysis, reported in 2020, showed that "[t]he partial DNA profile obtained from the anal swab from [Maria] is consistent with a mixture of two individuals with [Maria] as an assumed contributor." Because of the quality of DNA obtained, however, no comparison was made to the foreign contributor. Testing of the vaginal, breast, and thigh swabs did not indicate the presence of a DNA profile other than Maria's. Following Heard's analysis, the samples were given to another analyst, Caitlin Lott, who conducted Y-STR testing.

Lott testified about the differences between STR and Y-STR analysis as well as the results that she obtained in this case. STR is the "standard, traditional DNA analysis," whereas Y-STR testing is "male-specific DNA testing just on the Y chromosome," which only males have. The Y-profile is typically identical in male lineal descendants, and it is rare for males in the same line to have different Y-profiles.

Y-STR testing is more sensitive than STR testing and "can detect in that Y chromosome if there's also a female in that mixture, potentially." Because Y-STR testing "essentially ignores the female DNA," analysts can "develop male-specific Y-STR profiles from a sample that had low quantity DNA detected in it." Lott testified that it is common not to get any results from DNA testing in sexual assault cases, which could be for several reasons: "there was no DNA there to be begin with," "it degraded over time so it can no longer be detected," or "it's such a low-level DNA that our instruments still aren't sensitive enough to detect it." She could not determine "whether a crime did or did not occur from" the absence of DNA.

Although Maria's vaginal swab indicated the presence of a small amount of male DNA, it was "at such a low level that it was not interpretable." Lott could not determine if the

10

DNA came from one or multiple individuals. A partial DNA profile was obtained from the anal swab, interpreted to be "an indistinguishable mixture of at least two" males contributing similar amounts of DNA. Lott was unable to draw any conclusions as to whether Hernandez was one of the contributors and could neither include nor exclude him. No male DNA was recovered from the left thigh or left breast swab.

Lott also testified, including on recall by the defense, regarding DNA transfer. She explained that analysts are sometimes unable to develop DNA profiles from a skin swab and that obtaining a profile depends in part on how hard the swab is applied, whether the individual is sweating at the time, and whether there are any "downstream effects" causing the sample to degrade over time. Skin is not the most "abundant source" of DNA, and it is "generally a little bit easier to get a full profile" from bodily fluids. Nevertheless, licking something does not always leave a "large deposit of DNA"; "varying degrees of DNA can be left behind," and the amount of deposited DNA depends on "how much surface area was covered" and "how much saliva was deposited." She had seen alleged saliva-to-skin contact where no DNA results were returned. Moreover, wiping, urinating, defecating, showering, changing clothes, or the movement of clothing can remove transferred DNA over time. Lott testified that in a scenario where one person licks another's body, DNA would be transferred but that the detection of that DNA would depend on what occurred between the licking and the collection of a DNA sample. She testified that it was "fair" to say that "a lot can happen in three hours."

Dr. Robert C. Benjamin testified as a DNA expert for the defense concerning the DNA testing in this case. He confirmed that the STR and Y-STR reports appeared to be

supported by the underlying data and clarified that Hernandez was excluded as a contributor to the profile obtained from STR testing of Maria's vaginal swab.[2]

With respect to the Y-profiles of male lineal descendants, Benjamin testified that Hernandez and his son would have the same Y-STR profile, excusing the slight chance of a mutation. Benjamin explained that current Y-STR testing cannot distinguish between a father and son and that he did not know "what on earth" Lott meant by testifying that the two male profiles obtained from the anal swab were insufficient to determine a familial relationship. He testified that if the two males were related, "then you'd just have one profile. It would look like one, even though there's two people there."

Benjamin also testified about DNA transfer. The fact that Maria's DNA profile was not obtained from her breast swab, he noted, was a "good demonstration of honestly how little DNA there is, a lot of times, on your skin if it's not an area that, we'll say, deposits a lot there." He testified that saliva is "a very rich source" of DNA that "can actually beat out blood" and that there is "no distinguishable difference between a saliva sample and a buccal swab."

Dr. Aaron Pierce, an expert in forensic interviews, testified that he reviewed transcripts of Maria's and Ana's 2010 interviews for the defense. He testified that forensic interviewers in Texas "essentially work for law enforcement"; that "we know that not all allegations of sex abuse are true"; and that younger children can be more easily influenced by

---

[2] Heard—after asserting that Maria was an "assumed contributor" to the samples—testified that she did not find "any other indication of another profile" in the vaginal-swab results. Heard's report stated:

> The DNA profile from the vaginal swab from [Maria Perez] is consistent with the DNA profile from [Maria Perez]. Roberto Hernandez is excluded as the contributor of the DNA profile from the vaginal swab from [Maria Perez].

leading questions and suggestive phrasing, are more susceptible to coaching, and can "be more easily misled in terms of misunderstanding the behavior of other people." He also testified that repetitive questioning can cause children to change their answer and that Rodriguez had asked the children many times in different ways whether anything had happened to them. Rodriguez should not have specifically asked about Hernandez, used peer-pressure questions in Ana's interview, and was improperly suggestive when asking Maria if her "daddy d[id] something wrong." Pierce testified that Maria's use of the word "rape" indicated that she might have heard it from someone else.

Hernandez's wife testified that they had dated since 2013 and been married since 2015. She testified that their families were from the same town in Mexico, that she had last seen him in Mexico in 2006, that she came to the United States in 2012, and that she would have known if he had returned to their town in 2010, as Mother had informed Stacy. She also testified that she had never observed him participate in a witchcraft ceremony and that Mother twice threatened him in January 2015: Mother told him, "[I]f I find out that you're married to someone else, you're going to find out who I am," and warned, "If I ever know that you are with someone else, you're never gonna see your child again because I'm gonna tell that woman who you are and you are never going to see the child again."

During the jury's deliberation in the guilt-innocence phase, the jury foreman sent a note to the trial judge informing him that the jury was "deadlocked after extensive deliberation" and was unable to reach a unanimous verdict on counts IV and VI. The trial judge

read a supplemental *Allen*[3] charge to the jury instructing them to continue deliberating and, if possible, to "resolve [their] differences and come to a common conclusion, so that a verdict may be reached and this case may be disposed of."

The jury subsequently found Hernandez guilty of aggravated sexual assault of a child and indecency with a child by sexual contact, as alleged in counts IV and VI of the indictment, respectively.[4] He was acquitted on the remaining five counts. Following a hearing on punishment, he was sentenced to twenty-five years' confinement for aggravated sexual assault of a child and five years' confinement for indecency with a child.

On March 14, 2022, Hernandez filed a motion for new trial, asserting that the jury had received evidence from an outside source during its guilt-innocence deliberations. Attached to the motion was an affidavit from the jury foreman, P.M., which attested in relevant part:

(1)      Juror [W.Z.] informed jurors prior to and during deliberations about DNA facts and statistics that were not admitted into evidence during the trial.

(2)      Juror [W.Z.] shared with the Jury that he investigated the DNA evidence by touring a DNA lab.

(3)      After communicating to the Court that the Jury had reached a deadlock on Count 4 and Count 6 at approximately 7 p.m. on November 8, 2021 and after the Court directed us to continue deliberating, Juror [W.Z.] insisted that the information he learned from his visit to the DNA lab should shift their opinions on the verdict.

(4)      Juror [W.Z.] cited statistics and DNA facts he learned directly from his tour of the DNA lab.

---

[3] *See Allen v. United States*, 164 U.S. 492, 501 (1896) (permitting supplemental jury instruction that reminds jury that if it is unable to reach verdict, mistrial will result, case will still be pending, and there is no guarantee that second jury would find issue any easier to resolve).

[4] Counts IV and VI alleged that Hernandez touched Maria's genitals and digitally penetrated her sexual organ and anus.

14

(5)     Juror [W.Z.] did not indicate he was a scientist or any type of expert on DNA evidence or that the statistics he was relaying to the Jury were based on his personal experience with DNA testing or scientific theory. Juror [W.Z.] was just relaying information he learned from sources outside the jury room.

(6)     This outside information impacted the Jury's verdict. The Jury went from being deadlocked and almost evenly split between "not guilty" and "guilty" at 7 p.m. to returning a unanimous "guilty" verdict at approximately 10 p.m. on November 8, 2021 after the Jury was instructed Mr. [W.Z.'s] visit to the DNA lab was the basis for his information.

The trial court denied Hernandez's motion without a hearing, and this appeal followed.

## DISCUSSION

In his only issue, Hernandez contends that "[t]he trial court abused its discretion by denying [his] motion for new trial without granting an evidentiary hearing."

## I.     Standard of Review

"The right to a hearing on a motion for new trial is not absolute." *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). A hearing on a motion for new trial is mandatory only when the trial court determines that the motion and accompanying affidavit(s) raise matters that are both not determinable from the record and reasonable, meaning they could potentially entitle the defendant to relief. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009); *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). The trial judge's discretion and our review are limited to these two requirements. *Smith*, 286 S.W.3d at 340. To be sufficient to entitle the defendant to a hearing, the motion and affidavit(s) need not establish a prima facie case for a new trial or reflect every component legally required to establish relief but must "reflect that reasonable grounds exist for holding that such relief could be granted." *Wallace*,

106 S.W.3d at 108 (quoting *Martinez v. State*, 74 S.W.3d 19, 22 (Tex. Crim. App. 2002)); *see Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994); *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993). "The requirement of an affidavit is to prevent 'fishing expeditions' and is a prerequisite to obtaining a hearing and as a matter of pleading." *Klapesky v. State*, 256 S.W.3d 442, 454 (Tex. App.—Austin 2008, pet. ref'd) (citing *Reyes*, 849 S.W.2d at 816; *McIntire v. State*, 698 S.W.2d 652, 658 (Tex. Crim. App. 1985)).

The purposes of a hearing on a motion for new trial are to decide whether the case should be retried, give the defendant an opportunity to fully develop the matters raised in his motion, and prepare a record for presenting issues on appeal in the event the motion is denied. *Smith*, 286 S.W.3d at 338; *Wallace*, 106 S.W.3d at 108. We review a trial court's denial of a hearing for an abuse of discretion. *Wallace*, 106 S.W.3d at 108; *Corporon v. State*, 586 S.W.3d 550, 557 (Tex. App.—Austin 2019, no pet.). "In so doing, we reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Smith*, 286 S.W.3d at 339. The question is not whether the trial court has reasonably denied the motion for a new trial, but rather whether the court has reasonably denied the defendant a hearing on his motion for a new trial. *See Wallace*, 106 S.W.3d at 108.

## II.     Other Evidence

Hernandez's motion for new trial was based in relevant part on the argument that the jury was improperly subjected to an "outside influence"[5] when juror W.Z. informed his

---

[5] In using the phrase "outside influence," P.M.'s affidavit and Hernandez's brief conflate Rule of Appellate Procedure 21.3(f), which provides a basis for entitlement to a new trial, with Rule of Evidence 606(b), which "prohibits a juror from testifying about 'any matter or statement occurring during the jury's deliberations,' with two exceptions," including "whether any outside influence was improperly brought to bear upon any juror." *McQuarrie v. State*, 380 S.W.3d 145,

fellow jurors of DNA "facts and statistics" he had learned after touring a DNA laboratory.[6]

Hernandez asserts that "[h]ad an evidentiary hearing been held on [his] motion, . . . [he] would have had an opportunity to address the egregious actions of a juror that influenced the jury's verdict, depriving [Hernandez] of a fair and impartial trial."

"The Sixth and Fourteenth Amendments of the United State[s] Constitution guarantee the right to be tried by impartial, indifferent jurors whose verdict is based solely upon the evidence developed at trial." *Compton v. State*, 666 S.W.3d 685, 725 (Tex. Crim. App. 2023), *cert. denied*, No. 23-5682, 2024 WL 1607737 (U.S. Apr. 15, 2024); *see Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) ("Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial'" (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978))). This principle is codified in Texas Rule of Appellate Procedure 21.3(f), which provides that a defendant must be granted a new trial "when, after retiring to deliberate, the jury has received other evidence; when a juror has talked with

---

150 (Tex. Crim. App. 2012) (quoting Tex. R. Evid. 606(b)); *see* Tex. R. App. P. 21.3(f). Rule 606(b) likewise prohibits a trial court from receiving "a juror's affidavit or evidence of a juror's statement on these matters." Tex. R. Evid. 606(b). While it is correct that "[a] juror's affidavit states reasonable grounds only if the matter discussed in the affidavit would be admissible in a subsequent hearing on the motion for new trial," *Dunkins v. State*, 838 S.W.2d 898, 899 (Tex. App.—Texarkana 1992, pet. ref'd), the affidavit is "but a pleading that authorizes the introduction of supporting evidence" and "is not evidence in itself," *Stephenson v. State*, 494 S.W.2d 900, 909–10 (Tex. Crim. App. 1973). In other words, Rule 606(b) does not offer a basis for Hernandez to demonstrate entitlement to a hearing on his motion for new trial but merely limits his attempt to prove that Rule 21.3—which does offer such a basis—could have potentially entitled him to relief. *See Fino v. State*, No. 05-17-00169-CR, 2018 WL 3829781, at *16 (Tex. App.—Dallas Aug. 13, 2018, pet. ref'd) (mem. op., not designated for publication).

[6] Although Hernandez raised other grounds in his motion for new trial, he does not advance them on appeal in arguing that the trial court abused its discretion by denying his request for a hearing.

17

anyone about the case; or when a juror became so intoxicated that his or her vote was probably influenced as a result." Tex. R. App. P. 21.3(f).

To merit reversal under Rule 21.3(f), the "other evidence" must be (1) received by the jury and (2) detrimental to the defendant. *Najar v. State*, 618 S.W.3d 366, 374 (Tex. Crim. App. 2021) (citing *Stephenson v. State*, 571 S.W.2d 174, 176 (Tex. Crim. App. 1978)). "Whether the jury has 'received' other evidence is a fact question to be decided by the trial court and may also be a question of degree in some circumstances." *Guevara v. State*, 4 S.W.3d 771, 779 (Tex. App.—San Antonio 1999, no pet.) (citing *Guice v. State*, 900 S.W.2d 387, 389 (Tex. App.—Texarkana 1995, pet. ref'd)). "In determining whether evidence was 'received' by the jury, a court may consider how extensively the evidence was examined by the jury." *Bustamante v. State*, 106 S.W.3d 738, 743 (Tex. Crim. App. 2003). A "passing remark" does not qualify as "other evidence." *Najar*, 618 S.W.3d at 374.

Whether evidence is detrimental "depends on 'the character of the evidence, in light of the issues before the jury, not the effect of such evidence on the jurors.'" *Id.* (quoting *Garza v. State*, 630 S.W.2d 272, 274 (Tex. Crim. App. 1981)). "The Court of Criminal Appeals has explained that evidence is detrimental to the accused when 'reason and common sense can see it was harmful to the accused.'" *In re M.A.F.*, 966 S.W.2d 448, 450 (Tex. 1998) (quoting *Collier v. State*, 297 S.W.2d 160, 162 (Tex. Crim. App. 1956)). If evidence is detrimental, "the presumption of injury to the defendant will obtain, and it is unnecessary for the accused to prove that the jurors' votes were influenced by the improper evidence." *Id.*; *see Carroll v. State*, 990 S.W.2d 761, 762–63 (Tex. App.—Austin 1999, no pet.) (recognizing presumption of injury, assuming that constitutional harmless error analysis applies, and stating that appellate court must reverse unless it determines "beyond a reasonable doubt that the error did not contribute[] to the

18

conviction or the punishment"); *cf. Lucero v. State*, 246 S.W.3d 86, 95 (Tex. Crim. App. 2008) (where foreman read Bible during punishment deliberations, concluding that Court need not determine whether action was "outside influence" under Rule 606(b) because "record presents no 'reasonable grounds' that this Bible reading affected the jury's verdict").

The trial court did not abuse its discretion by refusing Hernandez's request for a hearing on his motion for new trial because the motion's accompanying affidavit was conclusory, and the court could have reasonably concluded that the "other evidence" received by the jury was not detrimental.

First, we note that while the State does not directly assert that P.M.'s accompanying affidavit was conclusory, "a court of appeals may properly affirm the denial of a hearing on a motion for new trial based upon a holding that the affidavit supporting the motion was insufficient, even though that specific claim was not made by the state." *Martinez*, 74 S.W.3d at 21. A motion for new trial must be accompanied by an affidavit that sets out the factual basis for the raised claims and "specifically show[s] the truth of the grounds of attack." *King v. State*, 29 S.W.3d 556, 569 (Tex. Crim. App. 2000); *see Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009); *Colone v. State*, 573 S.W.3d 249, 260 (Tex. Crim. App. 2019). "[A]ffidavits that are conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed; thus, no hearing is required." *Smith*, 286 S.W.3d at 339. "Bare assertions, without supporting factual allegations, are not sufficient to entitle a party to a hearing, and a trial court is not required to hold a hearing to conduct a 'fishing expedition.'" *Colone*, 573 S.W.3d at 260.

P.M.'s affidavit attested only that juror W.Z. "prior to and during deliberations" shared "DNA facts and statistics that were not admitted into evidence during the trial." P.M.

19

also attested that W.Z. "shared with the Jury that he investigated the DNA evidence by touring a DNA lab" but that other jurors were not swayed by his information until they were "instructed Mr. [W.Z.]'s visit to the DNA lab was the basis for his information." Nowhere in his affidavit does P.M. state what the "facts and statistics" were, whether they directly concerned or were relevant to the DNA testing in this case, or how they could have influenced the jury. Although Hernandez did not need to plead a prima facie case, he had to "'at least allege sufficient facts that show reasonable grounds to demonstrate that he could prevail' on the merits of his claim." *Corporon*, 586 S.W.3d at 557 (quoting *Hobbs*, 298 S.W.3d at 199–200). From this record, the trial court could have reasonably concluded that the affidavit was deficient and did not entitle Hernandez to a hearing on his motion. *See, e.g.*, *Colone*, 573 S.W.3d at 260 (finding that defendant's "affidavits made a number of bare assertions without alleging supporting facts to show that those assertions were true" where he alleged that State leaked trial information through jailhouse snitch but did not show that leaked information was untruthful or was known to jury); *King*, 29 S.W.3d at 569 (concluding that "[n]one of [defendant's] bare assertions establish facts entitling him to a new trial" where his motion and affidavit explained neither who threatened prospective witness or what witness's testimony would have been); *Jordan*, 883 S.W.2d at 665 (holding that affidavit was deficient where defendant alleged counsel failed properly to investigate facts or subpoena witnesses but did not explain why counsel's investigation was deficient, what further investigation would have revealed, or what witnesses would have said).

Even if the affidavit had been sufficient, the trial court could have reasonably concluded that any information provided by W.Z. was not detrimental to Hernandez. Three

20

DNA experts, Heard, Lott, and Benjamin, testified at length at trial.[7] While the DNA evidence played a substantial role in both party's cases, the defense argued that it was central to Hernandez's case and necessitated acquittal. Defense counsel repeatedly emphasized that the amounts of DNA recovered were minuscule, which she asserted disproved Maria's account because Hernandez's saliva would have been a rich source of DNA. In her opening statement, counsel insisted, "DNA results will come back in 2011 and they do not support [Maria]'s claim." Counsel reiterated the DNA evidence's benefit to Hernandez in closing: "Saliva. Man, the saving grace in this case, in my opinion, is that DNA test." She also stressed that Hernandez could not be included as a contributor to any of the samples, hypothesized that the DNA evidence had led Maria to change her story, and contended that it refuted the State's theory that the two male profiles obtained from the anal swab were of Hernandez and his son. In contrast, the State argued that it was probative that *any* male DNA was recovered from Maria's vaginal and anal swabs and underscored that multiple witnesses had testified to the mechanisms by which DNA evidence could have been removed before testing.

The trial court could also have inferred that W.Z.'s facts and statistics had not been detrimental to Hernandez because at least one juror did not recall W.Z.'s sharing the information. Attached to Hernandez's motion was not only P.M.'s accompanying affidavit but a

---

[7] The comprehensiveness of the DNA testimony presented during the trial makes the conclusory nature of P.M.'s affidavit all the more apparent. "Other evidence" does not include evidence that is redundant or cumulative of that presented at trial. *See Perez v. State*, No. 03-10-00265-CR, 2011 WL 3518047, at *4 (Tex. App.—Austin Aug. 12, 2011, pet. ref'd) (mem. op., not designated for publication); *Flix v. State*, 782 S.W.2d 1, 2–3 (Tex. App.— Houston [14th Dist.] 1989, pet. ref'd). Yet without knowing the substance of the information W.Z. shared, we cannot say whether it was cumulative.

21

questionnaire[8] completed by juror L.H., in which she answered "No" when asked if "any juror communicate[d] information to other jurors regarding <u>DNA testing, results or statistics</u> that was not presented as evidence during the trial," if "any juror communicate[d] that DNA or Y chromosomes had a short life span and/or would not be available for testing within hours of being collected," and if she observed "any juror referring to information, facts, data, statistics, etc. that was not introduced at trial as evidence and to which the Defendant was not provided an opportunity to cross-examine."

Moreover, "DNA facts and statistics" is evidence of a character qualitatively different from "other evidence" found to be detrimental. We recited a catalogue of such evidence in *Carroll v. State*, in which the jury received a mugshot of the defendant that was unconnected with the trial in that case:

> *Bearden v. State*, 648 S.W.2d 688, 692 (Tex. Crim. App. 1983) (juror commented on alcohol-service policies of nightclub in appeal from DWI conviction); *Alexander v. State*, 610 S.W.2d 750, 752 (Tex. Crim. App. 1980) (juror stated during deliberations that he knew accused and that "his character was bad"); *Hunt v. State*, 603 S.W.2d 865, 868–69 (Tex. Crim. App. 1980) (juror speculated on details of murder based on his Marine Corps training); *Stephenson v. State*, 571 S.W.2d 174, 176 (Tex. Crim. App. 1978) (juror claimed to know facts personally, and other jurors claimed to have personal knowledge that some witnesses were not truthful); *Shivers v. State*, 756 S.W.2d 442, 443–44 (Tex. App.—Houston [1st Dist.] 1988, no pet.) (jury foreman drove to crime scene during jury deliberations and reported to jury that eyewitness's view was not obstructed by tree).

990 S.W.2d at 762–63 (citing *In re M.A.F.*, 966 S.W.2d at 450–51) (after retiring to deliberate, jury discovered marijuana cigarette in juvenile's jacket, which had been admitted as exhibit). In

---

[8] While L.H. swore that her answers were true and correct to the best of her knowledge and signed below the jurat, the questionnaire was not notarized.

contrast to the evidence in these cases, there is nothing inherently indicative of bias or detrimental to Hernandez's defense in information about DNA testing.

Although P.M. averred that W.Z.'s information "impacted the jury's verdict" because it "went from being deadlocked and almost evenly split" at 7 p.m. to "returning a unanimous 'guilty' verdict" around 10 p.m., we do not consider the evidence's effect on the jury in deciding whether it was detrimental. *See Najar*, 618 S.W.3d at 374 (quoting *Garza*, 630 S.W.2d at 274). We also note that the trial court read a supplemental so-called "*Allen* charge" or "dynamite charge" to the jury during that interval.

For these reasons, we cannot say that the trial court's denial of Hernandez's request for a hearing on his motion for new trial "was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010) (quoting *Smith*, 286 S.W.3d at 339–40); *see also State v. Gonzalez*, 855 S.W.2d 692, 695 n.4 (Tex. Crim. App. 1993) (adding that it is not reviewing court's place to substitute its judgment for that of trial court but to determine whether its decision was unreasonable or arbitrary); *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded by rule on other grounds as recognized by State v. Herndon*, 215 S.W.3d 901, 906 n.16 (Tex. Crim. App. 2007) (clarifying that "[a] trial court abuses its discretion only when no reasonable view of the record could support the court's ruling"). We overrule Hernandez's sole issue.

## CONCLUSION

Having overruled Hernandez's only issue, we affirm the trial court's judgments of conviction.

_____

Edward Smith, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed:   April 24, 2024

Do Not Publish